**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Larry Lewis, | No. CV-18-02191-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Unum Life Insurance Company of America, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff's Opening Brief and Motion for Summary Judgment. (Doc 79.) Defendant Unam Life Insurance Co. responded, (Doc. 85), and Plaintiff replied. (Doc. 86.) Defendant has filed a Motion to Strike certain evidence and arguments in Plaintiff's Reply. (Doc 89.) Plaintiff has responded, (Doc. 90), and Defendant has replied. (Doc. 91.) The Court held oral argument on March 22, 2021 and now enters the following order.

## I.    FACTUAL BACKGROUND

This case arises out of Defendant Unum Life Insurance Company's decision to deny Plaintiff, an employee of Drury Hotels Company, LLC, long-term disability ("LTD") benefits and a Life Insurance Premium Waiver ("LIPW").  Plaintiff had been working for 3 years with Drury Hotels ("Drury") as a Hotel General Manager, and was a participant in the Drury Hotels Company Long Term Disability and Life Waiver of Premium Plans—both of which Drury funded by purchasing group insurance policies from Defendant. (Doc. 85 at 2.) Defendant admits that the Plan in which Plaintiff participated is governed by the

1   Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq*.

2   **A.      Plaintiff's Initial Medical Event and Grant of STD**

3          Plaintiff claims that in August of 2015 he began displaying various health issues.

4   On August 10, 2015 he was evaluated by his primary care physician (PCP), Dr. Anderson,

5   who noted Plaintiff was complaining of issues with blood pressure, bouts of fatigue,

6   intermittent sweating, and headaches. (Doc. 78 at 180-81.) Labs showed the Plaintiff's

7   thyroid and testosterone levels were off, and Dr. Anderson raised the dosage of his thyroid

8   medication to combat the symptoms. On August 26, 2015, Plaintiff was admitted to the

9   emergency room (ER) reporting issues with chest pain, shortness of breath, erratic blood

10  pressure, sweating, chills, and unequal eye pupils. (Doc. 78-1 at 4.) The ER gave Plaintiff

11  a transthoracic echocardiogram, subjected him to a treadmill stress test, an X-ray, and other

12  tests, none of which showed any issues that would cause his symptoms. (*Id*. at 9-13.)

13         After Plaintiff's trip to the ER, he submitted a claim for short term disability (STD)

14  to Defendant on September 17, 2015. (Doc. 78 at 198-205.) A clinical consultant of the

15  Defendant reviewed Plaintiff's medical information in October of 2015 and approved the

16  claim for short term disability, noting that Plaintiff had been hospitalized. (*Id*. at 49.) As

17  the clinical reason justifying the claim, Defendant's consultant noted:

18

19              Based on the findings provided [restrictions and limitations] would be
                supported to allow for ongoing evaluation and work up for etiology of
20              symptoms related to palpations and elevated BP to current hospitalization.
                Once this is confirmed duration of recovery can be determined depending on
21              current treatment.

22  (*Id*.) The same consultant reviewed Plaintiff's STD claim on November 6, 2015. (*Id*. at

23  47.) Referencing the additional medical records and testing available to her, the consultant

24  recommended against continuing Plaintiff's STD benefits through the "max date" of

25  November 24, 2015. (*Id*.) As her rational, the consultant noted the current testing was

26  negative and the other testing of Plaintiff completed by the Mayo Clinic had also been

27  negative. The consultant noted Plaintiff had also completed "neuropsych" testing by this

28  point in time. (*Id*.) In light of the completed testing, the consultant reasoned that further

benefits would require a confirmed diagnosis and specific restrictions and limitations. (*Id.*) However, Defendant's employee handling Plaintiff's claim continued to approve STD benefits through the "STD max date." (*Id.* at 46.) The same employee noted it would soon be necessary to evaluate the Plaintiff for long term disability (LTD) and life waiver of premium (LWOP) eligibility. (*Id.*)

### B. Plaintiff's Request for LTD/LWOP and Relevant Plan Terms

A separate department of the Defendant handled Plaintiff's LTD and LWOP claims. (Doc. 85 at 4.) To be eligible for LTD benefits, a plaintiff must satisfy the Plan's definitions of disability. For the first 60 months, the Plan defines disability as when a claimant is limited from performing the material and substantial duties of their regular occupation due to sickness or injury and has lost 20% or more in his or her indexed monthly earnings due to that sickness or injury. (Doc. 78 at 67.) The requirements to qualify for LWOP are almost verbatim the same as the required showing of disability for LTD benefits in the plan. (Doc. 78-7 at 338.)

In order to determine if Plaintiff qualified for LTD, Defendant's claims representative interviewed the Plaintiff and reviewed his medical records. (Doc. 85 at 5.) This interview took place near the beginning of December 2015. (Doc. 78 at 216-222.) During his interview, Plaintiff reported that he still had uneven pupils, shortness of breath, and fatigue, and that he had "episodes" at least once a day. (*Id.*) When asked by the interviewer, Plaintiff stated he thought it was possible he might be able to work a desk job. (*Id.*) An early claim analysis done by the Defendant indicated that Plaintiff was still reporting symptoms and that Plaintiff's testing had uniformly resulted negative for any discernable cause. (*Id.* at 261.) The same report noted Plaintiffs status was not clear and he still had no formal diagnosis. (*Id.*)

Defendant's Motion notes the various medical providers whose records were considered in reviewing Plaintiff's claims. The records spanned visits with specialists practicing in the areas of internal medicine, endocrinology, cardiology, electrophysiology, urology, neurology, pain medicine, neuropsychology, sleep medicine, and ophthalmology.

(Doc. 78 at 105-12, 115-119, 122-24, 127-32; Doc. 78-1 at 34-41, 58-63, 73-75; Doc. 78-6 at 58-59.) Defendant also notes various tests undergone by the Plaintiff that it considered in deciding his claim. These included Plaintiff's urine studies, CT scans and ultrasounds of his abdomen, MRIs and MRAs of his head and neck, spinal x-rays, CT scans and X-rays of his chest, multiple EEGs a neuropsychological exam, and other tests and studies. (Doc. 85 at 5-6.) Many of the tests came back with normal or negative results and none of the tests established a cause for Plaintiff's symptoms. (*Id.*)

Defendant referred Plaintiff's medical records for review by a clinical nurse. (Doc. 78-1 at 161-71.) The clinical nurse reviewed his records and found that while Plaintiff was having verified issues with sleep apnea and speech issues, neither of those issues kept him from working. (Doc. 78-1 at 169.) The clinical nurse was asked whether "the existence, intensity, frequency, and duration of [Plaintiff's] reported shortness of breath, vision issues, speech issues, migraines, weakness, fluctuation [*sic*] blood pressure, and numbness were consistent with the clinical examinations and diagnostic findings in [Plaintiff's] claim file." The clinical nurse responded they were not consistent in light of the extensive diagnostic and imaging studies that had resulted negative. (*Id.* at 170.) The report mostly notes the lack of evidence supporting the existence of Plaintiff's symptoms, and does not appear to undertake any analysis of whether those symptoms, taken together, would be sufficient to qualify him for disability if they were occurring. (*Id.* at 161-171.) However, the report does note that Plaintiff's PCP had recommended he start to "get back into life" to see what he could handle. (*Id.* at 168.) Further, Defendant's reviewers contacted Plaintiff's various attending physicians but did not find any that had formally placed restrictions or limitations on Plaintiff's activities. (*Id.* at 156, 168, 190.) In light of these findings, Defendant denied Plaintiff's claim for LTD "because [Plaintiff] had completed his medical evaluation and there was no evidence that his symptoms would prevent him from performing his regular occupation." (Doc. 85 at 7.)

### C. Plaintiff's Initial Appeal

Plaintiff appealed the denial of his claim, which allowed a new slate of Defendant's

employees to review his claim. Plaintiff argued that he had not in fact been released back to work by his doctor and had further outstanding appointments. (Doc. 78-1 at 240.) Plaintiff argued that when his doctor had advised him to "try[] to get back to normal life" it was simply because he had no diagnosis and the doctor could not explain his symptoms, it was not a release to work. (*Id*.) Plaintiff also attached the medical records from his neuropsychological evaluation for consideration on appeal. (*Id*. at 241-260.) The doctor who undertook Plaintiff's new neuropsychological evaluation, Dane Higgins, concluded that Plaintiff had mild cognitive impairment and that his pattern of neurocognitive deficits was consistent with vertebrobasilar artery syndrome.[1] (*Id*. at 640.) Plaintiff was also given a Victoria Symptom Validity Test ("VSVT")[2] as part of the neuropsychological evaluation. (*Id*. at 648.) At the conclusion of his testing, Dr. Higgins opined that Plaintiff would "experience difficulty completing basic tasks associated with typical job duties, as well as complex tasks,…[and] significant difficulty learning new skills and completing key tasks in any work setting." (Doc. 78-1 244.) Dr. Higgins found that "from a neurocognitive perspective, one would expect him to experience difficulty gaining or maintaining gainful employment." (*Id*.)

After Plaintiff submitted his additional documents, his claim file was sent to a senior clinical consultant who completed a written review of the claim on May 18, 2016. (Doc. 85 at 9.) In this written review, the senior clinical consultant again reviewed the entirety of Plaintiff's medical documents along with the new neurophysiological exam documents

---

[1] Defendant notes this finding of cognitive disability contrasts with the finding of the evaluation Plaintiff underwent four months prior at the Mayo Clinic. There, the Mayo Clinic doctor found that Plaintiff's Psychometric intelligence, learning, memory, attention and concentration, speech, visuospatial, and processing speed, ranged from high to low averages for his age. The only score which was below average was Plaintiff's fine manual motor speed in his right hand. (Doc. 78-1 at 472-73.)

[2] The VSVT is used to help judge the "good faith effort" made by the subject of a neurological exam. Notably this test itself cautions against over-relying on its results as a clinician and states that it should merely be a factor in the analysis. (Doc. 78-1 at 250.) Additionally the neurologist who administered this extensive testing made findings stating that the Plaintiff had engaged in his full effort. (Doc 78-2 at 7-8.)

submitted by Plaintiff with his appeal. (Doc. 78-1 at 296-301; Doc. 78-2 at 1-10.) After reviewing Plaintiff's claim and previous records as well as the records of Plaintiff's new neuropsychological examination, the Defendant's senior clinical consultant indicated he was unable to conclusively determine Plaintiff's ability to function or eligibility for LTD benefits. (Doc. 78-2 at 9.) The clinical consultant recommended the records be sent out for review by Dr. Johnathan McCallister. (Doc. 78-2 at 11.)

Dr. McCallister reviewed Plaintiff's medical records on May 19, 2016. (Doc. 78-2 at 11.) Dr. McCallister noted that Plaintiff had undergone extensive diagnostic testing that had not revealed any "organic cause for [Plaintiff's] symptoms." (*Id.*) Dr. McCallister examined Plaintiff's recent neuropsychological testing with Dr. Higgins but took issue with the results. While Dr. Higgins had opined that Plaintiff's neurological testing scores likely indicated "a significant decline," Dr. McCallister argued these statements were unfounded "in the absence of any pre-morbid…testing or data." (*Id.*) Dr. McCallister also took issue with Dr. Higgins' finding that Plaintiff's symptoms could be caused by vertebrobasilar artery syndrome stating that "the records do not reflect support for this diagnosis or any other specific organic pathology[.]" (*Id.*) Further, Dr. McCallister noted that none of the Plaintiff's attending physicians had provided or required any restrictions or limitations on the Plaintiff and stated that in his medical opinion the available medical records did not reflect a need for work restrictions. (*Id.* at 11-12.)

After Dr. McCallister completed his consultation, the Plaintiff's claim was returned to Defendant's employees who determined Plaintiff's claim had been correctly denied. (Doc. 78-2 at 19.) This decision was sent by letter to the Plaintiff on May 31, 2016. (*Id* at 19-26.) In the letter, Defendant explained that it had "concluded [plaintiff was] able to perform the duties of [his] occupation and no longer met the definition of disability beyond December 4, 2015. (*Id.* at 20.) Defendant further supported this decision by claiming Plaintiff's "records did not show any indication of speech or cognitive deficits[,]" and that "[b]eyond December 4, 2015 there were no physicians providing restrictions or limitations." (*Id.* at 21.) Defendant's denial letter walked through each of Plaintiff's

individual symptoms and discarded them as a basis for LTD benefits, explaining that each symptom was either unsupported by medical documentation, or manageable with medication. (*Id.* at 21-23.) As for Plaintiff's newly submitted neurological testing, Defendant's denial asserted that his neuropsychological testing did not support any significant pathology. (*Id.* at 23.) The denial specifically rejected Dr. Higgin's findings for the reasons cited by Dr. McCallister. (*Id.* at 23.) In conclusion, Defendant asserted that because no physician had provided limitations and restrictions on Plaintiff's abilities, and because he had undergone extensive negative workups and testing, his medical record did not support an award of LTD benefits. (*Id.*)

**D. Plaintiff's Request for Reconsideration and Supplemented Medical Records**

After Plaintiff's initial appeal was denied, Plaintiff, through his attorney, requested reconsideration of Defendant's decision. On June 22, 2017, Plaintiff submitted additional evidence for Defendant's consideration. At the same time, Plaintiff's attorney informed Defendant that additional information was still expected and would be forwarded to Defendant once obtained. (Doc. 87-2 at 66.) The records provided to Defendant spanned almost 700 pages and included multiple records detailing various neuropsychological, functional capacity, and vocational assessment evaluations Plaintiff had undergone. (Docs. 78-2 at 69-201; 78-3; 78-4; & 78-5 at 1-118.) Also included were medical records detailing Plaintiff's various visits to his PCP, the Mayo Clinic, the Veterans Administration ("VA"), the Barrow Neurological Institute, and other medical professionals. (*Id.*)

The Mayo records submitted by Plaintiff included office visits, his follow-ups with Drs. Graham and Patel, as well as notes from Plaintiff's psychotherapy sessions. Dr. Graham, an ophthalmologist, diagnosed Plaintiff's unequal pupils as being the product of simple anisocoria, though Plaintiff considered the diagnosis inaccurate and followed up with him several times. (Doc. 78-4 at 80-85, 123-128.) Dr. Patel, a neurologist, had two additional appointments with Plaintiff regarding his other symptoms. The notes from those appointments indicate that Plaintiff's migraines had improved from medication but were

not completely gone. (*Id.* at 118.) However, Dr. Patel also noted Plaintiff did continue to suffer from headaches that would worsen with activity, continued to have other symptoms, and had incurred some new additional symptoms as well. (*Id.*) The remaining and new symptoms described included: "sensory overload," continuing intermittent palpitations, dizzy spells, and imbalance. (*Id.*) Plaintiff also reported having trouble regulating emotion, struggles with concentration and confusion, issues with his speech and ability to articulate his thoughts, issues with his memory, and a continued loss of dexterity in his right hand. (*Id.*)

In light of Plaintiff's continued headaches and other symptoms, Dr. Patel adjusted Plaintiff's medication stating that since the Plaintiff was also reporting cognitive difficulties, he would leave the Topamax medication and add an additional low dose of Effexor. (*Id.* at 120.)  Dr. Patel explained that in addition to helping with the migraines, Effexor would also help address Plaintiff's anxiety and depression. (*Id.*) At the same time, Dr. Patel recommended Plaintiff undergo an autonomic reflex screen and try cognitive behavioral therapy to address his symptoms. (*Id.*) The autonomic reflex screen showed no evidence of autonomic neuropathy. (*Id.* 113-14.) However, Plaintiff did report that the Effexor had resulted in some improvement to his mood and sensory overload symptoms. (*Id.*)

Plaintiff also had four psychotherapy sessions with Mayo Clinic psychologist, Dr. Bethanne Keen. (*Id.* at 74-78, 85-99, 109-12.) Dr. Keen noted that Plaintiff's depression fell within the "moderately severe range" and that Plaintiff also reported that his psychological symptoms made it "somewhat difficult" to accomplish day-to-day work and home-care tasks. (*Id.* at 75.) Plaintiff reported the same list of symptoms to Dr. Keen as he had to Dr. Patel, and also reported having a single visual hallucination wherein he saw his deceased cat lying on his sofa. (*Id.* at 75-76, 96.) During his appointment with Dr. Keen on July 28, 2016, the doctor noted that "several times [Plaintiff] did have difficulty with finding words to express his thoughts." (*Id.* at 86.)

Plaintiff's submitted records from nine visits with his PCP, Dr. Anderson, who also

noted Plaintiff's complaints of ongoing symptoms. (Doc. 78-2 at 122-153.) Dr. Anderson referred Plaintiff for an MRI and to the Barrow Neurological Institute for a second opinion on Dr. Higgins' earlier neuropsychological evaluation opinion that Plaintiff suffered from vertebral-basilar artery syndrome.[3] (*Id*. 147-48.) Also Included was a letter from Dr. Anderson opining that Plaintiff was unable to work due to Plaintiffs issues with following directions or concentrating, limitations on his fine motor skills, and poor physical condition. (*Id*. 1446-47.)

Pursuant to Dr. Anderson's referral, Plaintiff visited the Barrow Neurological Institute in September 2016 to receive a second opinion regarding his neurological symptoms. (Doc. 78-5 at 86-92.) During his initial visit with Dr. Robers, Plaintiff's only manifesting symptom was his uneven pupils, and he scored a 25/30 on his mental status examination. (*Id*. at 92.) During his second appointment, Plaintiff scored perfectly on the mental status examination and his physical examination was otherwise normal, aside from uneven pupils. (*Id*. at 88.) Dr. Robers examined Plaintiff's medical records including the records of Plaintiff's previous neurological testing with Dr. Higgins. (*Id*. at 86, 89.) Dr. Robers stated that the subsequent imaging done on Plaintiff excluded vertebrobasilar insufficiency as a viable explanation of Plaintiff's symptoms and noted that Plaintiff's depression could be playing a role in his symptoms. (*Id*. at 86.) Dr. Robers also recommended additional neurological testing and prescribed additional medication for Plaintiff's ongoing headaches. (*Id*.)

Plaintiff also submitted his medical records from the Veteran's Administration ("VA") to Defendant. At the VA, Plaintiff was evaluated and treated by a battery of specialists including a neuropsychologist, two psychologists, a psychiatrist, two internists, an endocrinologist, a sleep medicine specialist, and a neurologist. Plaintiff began his care through the VA under nurse practitioner, Keo Soto, who attempted to address Plaintiff's

---

[3] Defendant asserts this diagnosis was later rejected by neurologists Dr. Solomon at the VA and Dr. Robers at Barrow because it was unsupported by Lewis's brain imaging. (*Id*. at 924, 1384, 1387.)

reported symptoms through changes to diet, increased exercise, and by having Plaintiff take codeine vitamin D in addition to his current medications. (Doc. 78-3 at 88.) He also scheduled Plaintiff a head MRI and lab work lab work, and referred Plaintiff to Dr. Madarang-Lewis for future visits. (*Id*. at 88-90.) Plaintiff's head MRI revealed a 3 mm lesion that the doctors believed to be a Rathke's cleft cyst. (*Id*. at 64-66, 161-65.) However, Plaintiff's previous MRI's showed the cyst was stable. (*Id*. at 5.) Plaintiff also saw neurologist Dr. Judith Solomon for his claimed headaches, cognitive issues, asymmetric pupils, and fatigue. (*Id*. at 61-69.) Dr. Solomon recommended lab work, a cervical MRI, a Circle of Willis MRA, neck MRA, but deferred further recommendations pending receipt and review of Plaintiff's prior medical records. (*Id*.) None of these tests came back with any notable abnormality. Plaintiff also saw Dr. Mahmoud Alsayed, who examined Plaintiff's blood work and reviewed the brain MRI findings. Alsayed ordered additional bloodwork, all of which came back normal. (*Id*. at 57-59) Plaintiff also saw a phycologist, Dr. Kimberly Snyder through the VA, having several sessions between November 2016 and May 2017. (Doc. 78-2 at 155, 172, 181; Doc. 78-3 at 11, 17, 45.)

Plaintiff had a third neuropsychological evaluation with Dr. De La Rosa-Trujillo, in mid-February 2017. (Doc. 78-2 at 198-201, Doc. 78-3 at 1-10.) He reported problems with his short-term memory, attention/concentration, language, and spatial orientation. (Doc. 78-2 at 200.) His wife reported that she was more concerned with his emotional volatility and behavioral changes than with his cognitive issues. (*Id*. at 201.) Dr. Trujillo opined that Plaintiff did "not meet criteria for neurocognitive disorder," (Doc. 78-3 at 8.) and instead recommended continued psychotherapy sessions, and that he transition to a psychotherapist who specializes in medical conditions, attend "a psychoeducation cognitive enhancement group, and take other steps to address his behavioral changes and emotional issues. (*Id*. at 8-9.)

Plaintiff also saw psychiatrist, Dr. David Downs during this time. (Doc. 78-2 at 195-98.) Plaintiff reported continuing "cognitive deficits including delayed retrieval of short-term memory" and a general slowness processing information, but Plaintiff stated this did

not interfere with his daily functioning. (*Id*. at 195.) Plaintiff followed up with Dr. Downs's nurse in late March 2017, reporting that he was feeling worse and his moods were all over the place and his brain felt like it had "butterflies." (Doc. 78-2 at 174-75.) Dr. Downs responded by recommending he increased his medication dosage. (*Id*. at 175.) In later visits Dr. Downs recommended continued therapy, anger management, and further medication. (*Id*. at 166.)

## E. Defendant's Review of Plaintiff's Newly Submitted Records

After receiving Plaintiff's newly proffered medical records, Christine Galloway, a registered nurse, and senior clinical consultant of Defendant, conducted an extensive review of the materials presented. (Doc. 78-5 at 150-173.) After considering all of Plaintiff's medical conditions and the opinions of Plaintiff's physicians as to his disability, Ms. Galloway concluded that Plaintiff's functional capacity for employment was unclear. (*Id*. at 172.) After consulting with a behavioral on-site physician (OSP), Ms. Galloway determined that the frequency of Plaintiff's testing and lack of a consistent and defined etiology for his symptoms required they obtain the raw data in order to assess the testing validity. (*Id*. at 191; Doc. 78-6 at 6.) Defendant obtained raw data from Drs. Walter and Higgins, (Doc 78-6 at 16, 47.), but did not receive the raw data from the Mayo Clinic or the VA before rendering its decision.

Defendant then referred the raw data received to two on-site physicians for review. Jana Zimmerman, PhD, conducted a neuropsychological review and Peter Brown, M.D., board-certified in psychiatry, conducted a psychiatric review.

Dr. Zimmerman reviewed Plaintiff's four neuropsychological examinations by Dr. Kirlin of the Mayo Clinic, Dr. Higgins, Dr. De La Rosa-Truiillo, and Dr. Walter in order to determine "whether the evaluations are valid and support the examiner's conclusions." (*Id*. at 92.) Based on her review of the records and the available raw data, Dr. Zimmerman opined that the weight of the data supported Dr. Kirlin and Dr. De La Rosa-Trujillo's evaluations, that Plaintiff's cognitive abilities were intact aside from the isolated finding of right-sided motor dysfunction. (*Id*. at 94-99.) Dr. Zimmerman also acknowledged that

every one of the doctors who examined Plaintiff suggested the possibility of a psychiatric condition for Plaintiff's symptoms, though they varied on the exact grounds. (*Id.*) Dr. Zimmerman also noted that all the Plaintiff's examiners believed there was contribution due to depression. (*Id.* at 98) However, Dr Zimmerman claimed that "the data relied on to support these opinions was insufficient in 2/16 [February 2016] and 2/17 [February 2017-…[and that] Plaintiff likely exaggerated in 3/17 [March 2017]." (*Id.*) Dr. Zimmerman also opined that Plaintiff's performance across his neurological exams was inconsistent and that the embedded validity scales on his tests showed inconsistent responding and symptom exaggeration, with the "highest correlation of fit with a fake bad profile followed by numerous psychotic disorders/conditions." (*Id.* at 99.)

Dr. Brown reviewed Plaintiff's file next to complete a psychiatric review. (*Id.* at 123-130.) After examining Plaintiff's conditions, Dr. Brown opined that there was evidence Plaintiff had inconsistently reported his symptoms and exaggerated his impairment which precluded "establishing any diagnosis or related level of symptoms or impairment." (*Id.*) Dr. Brown further noted that the "claimant's subjective reports must be interpreted with appropriate clinical caution." (*Id.*) In reaching this conclusion, Dr. Brown found it significant that despite extensive testing, Plaintiff still had received no diagnosis that would explain the nature, duration, or severity of Plaintiff's complaints. (*Id.*) Nor was there support for restrictions or limitations for any diagnosis or diagnoses during the relevant timeframe. (*Id.*)

After both Dr. Zimmerman and Dr. Brown gave their opinions, Plaintiff's claim was returned to Defendant's clinical consultant who wrote Plaintiff a letter denying his request for reconsideration. (Doc. 78-6 at 148.) Defendant asserted in the letter that Plaintiff's additional medical information did not support a finding that Plaintiff was prevented from performing his regular occupation beyond December 4, 2015. (*Id.*) With regards to Plaintiff's claimed symptoms of palpitations, shortness of breath, and issues with blood pressure, flushing, weakness, fatigue, memory issues, depression, and migraines, Defendant noted that no etiology or explanation for his symptoms had been found. (*Id.* at

149.) Defendant also stated that Plaintiff's hypothyroidism and low testosterone, while present, were not severe enough to prevent him from working. (*Id*. at 151.) Addressing Plaintiff's psychiatric complaints, Defendant asserted that his records only indicated fluctuating but mild symptoms or impairment. (*Id*. at 151-52.) Finally, with regards to Plaintiff's cognitive complaints and neuropsychological issues, Defendant noted that Plaintiff's different neuropsychological testing had varying results across different practitioners which precluded any reliable diagnosis. (*Id*. at 153.)

### F.  Onset of Litigation and Supplemented Records.

After this final denial, Plaintiff filed a complaint against Defendant on July 11, 2018, asserting Defendant's denial of benefits violated the Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. §§ 1001, *et. seq.*). (Doc. 1.) In the course of the litigation, Plaintiff filed a motion seeking to supplement the administrative record with an additional report from Dr. Walter responding to the criticisms and conclusions of Dr. Zimmerman and Dr. Brown. (Doc. 53.) The Court granted Plaintiff's request on March 31, 2020, at the same time granting Defendant's request to respond to Dr. Walter's supplemental report. (Doc. 61.)

Dr. Walter wrote two supplemental addendums addressing the concerns of Dr. Zimmerman and Dr. Brown. (Doc. 53-2 at 2-10.) Dr. Walter began this addendum by attacking Dr. Zimmerman's credentials. (*Id*. at 6.) Dr. Walter also noted that Plaintiff had not been subjected to the battery of tests Dr. Walter used in any of his previous evaluations, which to some extent explained the variations in results. (*Id*. at 7.) Dr. Walter further argues that Dr. Zimmerman seems to completely ignore the two evaluations of Dr. Higgins and himself that supported Plaintiff's disability and instead "cherry-picked" the evaluations in her favor without even attempting to integrate the results of the four evaluations. (*Id*.) He further argues that Dr. Zimmerman's reliance on the difference in reported symptoms in the different reports is hardly anomalous and is not the conclusive evidence of fraud or untruth by Plaintiff that Dr. Zimmerman claimed it was. (*Id*.) Dr. Walter also notes that Dr. Zimmerman's claims that Plaintiff was not putting forth a good effort are both unfounded

and unexplained in her report. (*Id*. at 8.) He further notes that in reaching her conclusions Dr. Zimmerman seems to purely pull results from the "PAI raw test data, and ignores other pertinent sources of information that are commonly used to reach a diagnosis." (*Id*.) Dr. Walter also noted that while the raw testing data is important, it is not an overabundantly accurate method of diagnosis when the patient's symptoms are the result of physical medical issues. (*Id*.) This is why the diagnostic possibilities generated by PAI report data have to be incorporated into other clinical data. (*Id*.) Dr. Zimmerman did not attempt any such correlation. (*Id*.)

Dr. Walter's second addendum was dedicated to refuting Dr. Brown's claims. He begins by noting that Dr. Brown's report is itself based on the report of Dr. Zimmerman, and thus his assumptions are undermined by Dr. Zimmerman's flaws. (*Id*. at 3.) Because of this Dr. Walter asserts that, like Dr. Zimmerman, Dr. Brown's conclusions and analysis fail to address the diversity of additional underlying medical problems which could impact Plaintiff's cognitive functioning and day-to-day functioning. (*Id*.) Further, Dr. Walter notes that Dr. Brown's conclusions regarding Plaintiff's inconsistent symptoms and exaggeration are largely based on Dr. Zimmerman's findings and not the result of any independent analysis. (*Id*.) Dr. Walter also notes that the Plaintiff was referred to Dr. Higgins, the doctor who originally opined that Plaintiff was cognitively unable to work, by the Plaintiff's PCP. (*Id*. at 4.) Further, Dr. Higgins testing was the first "in-depth" general neuropsychological evaluation of the Plaintiff, as the earlier testing by the Mayo Clinic was much shorter and was aimed toward specifically addressing whether Plaintiff had a seizure disorder. (*Id*. at 4.)

The Defendant responded to Dr. Walter's supplemental analysis by filing reports by Dr. Brown and Dr. Julie Guay refuting his analysis. Dr. Brown asserts that Dr. Walter has not presented any new data and had really only attacked Dr. Brown's report by claiming it was tainted by Dr. Zimmerman's biased conclusions. (Doc. 78-13 at 13.) Dr. Brown asserts that is not the case and that he reached his conclusion that Plaintiff was exaggerating his symptoms based on a "whole person" analysis. (*Id*.) Dr. Brown further asserts that Dr.

Walter's conclusions regarding impairment are unfounded or inconclusive. (*Id.*)

Dr. Guay also reviewed Plaintiff's neuropsychological data in conjunction with Dr. Walter's reports and Dr. Zimmerman's past findings. Dr. Guay noted that "there was no quantitative evidence of insufficient effort based on the reported performance validity scores," but stated there was some "quantitative evidence of symptom over-reporting." (*Id.* at 16.) Dr. Guay explained that this did not necessarily show Dr. Walter's report was invalid, but did "raise questions about the potential for symptom magnification and concerns for the validity of results" in light of the Plaintiff's inconsistent test scores across his neuropsychological exams. (*Id.*) Dr. Guay opined that overall, the data did not support Mr. Walter's conclusions regarding the Plaintiff's disabilities. Dr. Guay notes that Dr. Walter's findings are not backed up by the majority of Plaintiff's test tests, but are mostly based on the "multiplicity of psychological, physical, and medical complaints noted by the patient and corroborated by his wife, and consistently described by various treating doctors." (*Id.* at 16-17.) Dr. Guay argues this methodology is against the weight of the objective evidence provided by the Plaintiff's neuropsychological testing. (*Id.* at 17.)

## II.   PRELIMINARY DISPUTES

The Court will first address the issues raised by the parties effecting the scope and nature of its review. The parties disagree about the applicable standard of review in this case and each party has argued that certain evidence submitted by their opponent should be struck. Defendant submitted a motion to strike certain evidence in the Plaintiff's Reply, and the Plaintiff's opening brief requests the Court strike the report of one of Defendant's doctors. The Court will examine each of these issues in turn.

### A. Disputed Standard of Review

Plaintiff and Defendant dispute the applicable standard of review under which the Court should decide Plaintiff's claim. Plaintiff asserts that *de novo* review applies, while Defendant argues the Court should review its decision for abuse of discretion. The district court reviews a decision to deny benefits under an ERISA plan de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for

benefits or to construe the terms of the plan." *Gordon v. Metro. Life Ins. Co.*, 747 Fed. Appx. 594, 594 (9th Cir. 2019) (quoting *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 981 (9th Cir. 2005)). "When the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits, that determination is reviewed for abuse of discretion." *Id*. Defendants bear the burden of proving that the Plan unambiguously confers discretion upon the administrator. *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees of Transferred GE Operations*, 244 F.3d 1109, 1112 (9th Cir. 2001)

Plaintiff argues the policy terms do not grant Defendant discretionary authority because the only purported grant of discretion appears in the policy's Summary Plan Description ("SPD"). (Doc. 79 at 2.) Plaintiff argues that grants of discretion must be given in the actual plan's terms, not the SPD's, and because no such grant appears in the policy itself, *de novo* review applies. (*Id*. at 2.) Defendant argues that abuse of discretion review applies to this case because "[t]he SPD for each Plan…contain[s] discretionary language granting Unum 'discretionary authority to make benefit determinations under the Plan' and to 'interpret[]…the provisions of the Plan.'" (Doc. 85 at 22.) Defendant argues that contrary to Plaintiff's assertion, the Ninth Circuit held that SPD's can be considered plan documents. (Doc. 85 at 22. (citing *Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1210 (9th Cir. 2017)) Defendant also argues that regardless, abuse of discretion review should apply to this case due to the doctrine of judicial estoppel. (Doc. 85 at 21-22.) Finally, as Defendant noted at oral argument, the Plan also grants discretion in its certificate of coverage which is included as part of the policy in its table of contents. (Doc. 78 at 53.)

Here, the Court finds it unnecessary to resolve whether discretion can be granted in SPDs, nor need the Court determine whether judicial estoppel applies to the case. It is enough for the Court that the "certificate section" of Plaintiff's policy contains a grant of discretion. (*Id*.) The certificate section is included in the table of contents[4] for Plaintiff's

---

[4] Notably, part of Plaintiff's argument for why the SPDs were not policy terms and thus

LTD policy. (*Id*.) The certificate states in pertinent part that "when making a benefit determination under the policy, [Defendant] has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (*Id*. at 63.) Because this grant is contained in the terms of the policy itself, the Court finds the policy clearly grants the Defendant discretion to determine Plaintiff's eligibility for benefits.

## B.  Defendant's Motion to Strike

Defendant has filed a motion to strike new evidence in the Plaintiff's Reply. (Doc. 89.) Defendant seeks to strike Exhibit B, C, and D of Plaintiff's Reply.[5] (Doc. 89 at 1.) Defendant also seeks to strike Plaintiff's reply arguments based on the struck evidence and Plaintiff's "arguments made based on Dr. Marc Walter's additional response to the reports from Drs. Brown and Guay." (*Id*.) As cause for striking these materials, Defendant asserts that they are new arguments and evidence submitted for the first time in reply. (*Id*. at 4.). Further, Defendant argues the attached materials violate the Court's Case Management Order, (Doc. 21 at 4), and LRCiv 56.1(b).

Plaintiff argues that the evidence and theories in his Reply brief are not new arguments but is "extrinsic, rebuttal evidence that goes directly to Defendant's conflict and bias." (Doc. 90 at 2.) Plaintiff further argues that the additional medical reports attached to his Reply are necessary and merited because Defendant had used a new doctor to respond to one of Plaintiff's medical reports. (*Id*. at 3-4.) Finally, Plaintiff argues that the Court should simply grant Defendant's request to file a sur-reply (Doc. 90 at 6-7.)

"[A] motion to strike may be filed…if it seeks to strike any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order." LRCiv.7.2(m) "The decision to grant or deny a motion to strike is within the court's discretion." *Sunburst Minerals, LLC v. Emerald Copper Corp*., 300 F. Supp. 3d 1056, 1059

---

could not grant discretion was due to the fact the SPDs were not listed in the policy table of contents. (Doc. 79 at 2.)

[5]Exhibit B is the deposition of one of Defendant's former employees (Anthony Scuderi) taken in a different case. Exhibit C is the Licensing information of Dr. Jana G. Zimmerman. Exhibit D is the Response to OSP Addenda from Peter Brown, M.D. and Julie Guay, PsyD.

1    (D. Ariz. 2018).

2        i.    Reply Exhibit B (Scuderi Testimony)

3        Exhibit B to the Plaintiff's Reply is the deposition of one of Defendant's former

4    employees (Anthony Scuderi) taken in a different case. The Case Management Order

5    ("CMO") in this action expressly states: "No evidence may be submitted with a reply."

6    (Doc. 21 at 4.) Yet Plaintiff, without leave of the Court, attaches almost three-hundred-

7    and-fifty pages of new evidence. (Doc. 86-2.) Plaintiff argues Exhibit B and the arguments

8    based on Exhibit B are not "new" because they relate to arguments previously made in his

9    opening brief, (Doc. 90 at 3), but this does nothing to excuse Plaintiff's disregard for the

10   Court's CMO. Under the CMO, regardless of whether Plaintiff's arguments are rooted in

11   his opening brief, new evidence supporting those arguments is not allowed in a reply brief.

12   (Doc. 21 at 4.)  Further, despite Plaintiff's claims, the evidence is not needed to answer

13   some new issue raised by the Defendant. Plaintiff himself raised the issue of Defendant's

14   bias in his original brief, and any evidence supporting his argument should have been raised

15   there. For these reasons, Plaintiff's Reply Exhibit B and the arguments based on that exhibit

16   will be struck.

17       ii.    Reply Exhibits C and D

18       Exhibit C is a copy of the licensing information of Dr. Jana G. Zimmerman showing

19   that her professional license is active and in good standing. (Doc. 86-3.) Exhibit D is a new

20   response from Plaintiff's neuropsychologist defending his findings against the critiques of

21   Defendant's reviewers in a document titled: Response to OSP Addenda from Peter Brown,

22   M.D. and Julie Guay, PsyD. (Doc. 86-4.) Again, the Court notes that by attaching these

23   documents to his Reply, the Plaintiff blatantly disregards the case's CMO. Plaintiff's

24   disregard is especially unexplainable given that he explicitly discusses and challenges the

25   reports by Dr. Brown and Dr. Guay in his original motion, but does not attach this evidence

26   there. (Doc. 79 at 28.) As Defendant notes, this is partly due to the fact that Plaintiff's

27   doctor did not even write this report until four days prior to the filing of Plaintiff's Reply

28   brief. (Doc. 86-4 at 2.) However, the new nature of the evidence does not allow it here. The

evidence in question was cultivated specifically to rebut assertions made by the report of the Defendant's doctors. Plaintiff knew about the report of Defendant's doctors months prior to the substantive briefing on this motion. (Doc. 89 at 2-3.) He even challenges the substance of the report in his original motion. (Doc. 79 at 27-29.) Thus, he has no excuse for waiting until the eleventh hour to cultivate and present evidence, without the Court's permission, in his Reply.

      iii.    <u>Plaintiff's request for a Sur-reply</u>

In the closing pages of Plaintiff's Response to Defendant's Motion to Strike, (Doc. 90), Plaintiff suggests that any harm created by his disregard of the CMO can be cured by allowing Defendant to file a sur-reply. However, the Court will instead strike the evidence. Case Management Orders are rules, not suggestions that parties can ignore. If Plaintiff wished to include this evidence, it was incumbent upon him to either attach it to his opening brief or file a motion requesting the Court to amend the CMO. He did neither. The Court will not now, after a full, substantive briefing on the merits, allow the parties a "do-over" to reargue in light of Plaintiff's newly added evidence.

**C. Plaintiff's Request to Strike**

While not submitted as a separate motion, Plaintiff argues in his opening brief that the Court should strike Defendant's report by Dr. Guay and not consider it in this case. As grounds, Plaintiff alleges that Defendant was required to use the same reviewer from the original claim, Dr. Zimmerman. (Doc. 86 at 19.) Plaintiff accuses Defendant of "[A]ttempt[ing] to shoehorn medical opinions into the case at the eleventh hour via Dr. Guay[.]" (*Id.*) However, the Court notes that while accusing Defendant of acting in the eleventh hour, Plaintiff failed to make any objection Dr. Guay's report when it was admitted to the administrative record weeks before the submission of Plaintiff's opening brief. Instead, Plaintiff waited until the administrative record was closed and briefing on the merits was filed to challenge the report.

The Court will not strike Dr. Guay's report. Besides the fact that Plaintiff's objection comes so late in the day, his substantive argument for striking the report is unavailing.

Plaintiff's argument is essentially that when Defendant filed an expert report responding to Plaintiff's doctor, it had to use the same exact doctors that were used in the initial review. But this Court's order allowed the Defendant to file its "expert report in response to Dr. Walter's addendum," without mandating it use a specific person. (Doc. 61 at 6.) Further, the Court allowed Defendant to respond because Defendant would have been able to response if Plaintiff's report was submitted with the original claim. *See Gary v. Unum Life Ins. Co. of Am.*, No. 3:17-CV-01414-HZ, 2019 WL 1904679, at *14 (D. Or. Apr. 29, 2019). In the original claim Defendant would not have been *required* to use a specific in-house reviewer to answer Plaintiff's claim. Defendant would have been allowed to refer the issues raised in Plaintiff's report to a third party, as it did here.

## III.   LEGAL STANDARD

As indicated above, the certificate section of Plaintiff's LTD policy clearly grants the Defendant discretion to determine Plaintiff's eligibility for benefits. When a plan "unambiguously provide[s] discretion to the administrator", the standard of review shifts from the default, de novo, to abuse of discretion. *See Abatie v. Alta Health and Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (9th Cir. 1989)); *see also, Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 110-11 (2008). "Under the abuse of discretion standard of review, 'the plan administrator's interpretation of the plan will not be disturbed if reasonable." *Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1096 (9th Cir. 2012) (quoting *Conkright v. Frommert*, 559 U.S. 506, 512 (2010)). "ERISA plan administrators abuse their discretion if they render decisions without any explanation, . . . construe provisions of the plan in a way that conflicts with the plain language of the plan or rely on clearly erroneous findings of fact." *Day*, 698 F.3d at 1096. Under the abuse of discretion standard, a court considers "whether application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (quoting *United*

*States v. Hickson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).[6]

A reviewing court should weigh any conflict of interest or procedural irregularity as a factor in its review. *Glenn*, 554 U.S. at 108. When "the entity that administers the plan . . . both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," a conflict of interest is created. *Id.* "A conflict of interest is a factor in the abuse-of-discretion review, the weight of which depends on the severity of the conflict." *Demer v. IBM Corporation LTD Plan*, 835 F.3d 893, 900 (9th Cir. 2016). Even in the face of a conflict, "a deferential standard of review remains appropriate." This does not mean that plan administrators automatically prevail on the merits, only that a plan administrator's interpretation of the plan "will not be disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 512 (2010) (citation and quotation omitted). Similarly, "when a plan administrator's actions fall so far outside the strictures of ERISA that it cannot be said that the administrator exercised the discretion that ERISA and the ERISA plan grant, no deference is warranted." *Abatie*, 458 F.3d at 972. Alternatively, "[w]hen an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Id.* (internal quotation marks and citations omitted).  But "deference" is not a "talismanic word that can avoid the process of judgment." *Salomaa*, 642 F.3d at 673 (quoting *Glenn*, 554 U.S. at 118). "The nature and scope of the alleged violations will significantly affect the standard of review applied by the district court." *Hoffman v. Screen Actors Guild Prod. Pension Plan*, 757 Fed. Appx. 602, 604 (9th Cir. 2019).

A reviewing court should also consider procedural errors in deciding whether a plan administrator abused its discretion. *See Salomaa*, 642 F.3d at 674. Among other procedural

---

[6] In an ERISA benefits case, the traditional summary judgment standards are not necessarily appropriate. Fed. R. Civ. P. 56. When, as here, a plan administrator's determination is reviewed for abuse of discretion, "a motion for summary judgment is merely a conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material facts exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

irregularities, inconsistent reasons for denial and evidence of malice are rightly considered. *Id.* at 674. "A small procedural irregularity is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion, just as a court would weigh a conflict of interest." *Horton v. Phoenix Fuels, Co., Inc.*, 611 F.Supp.2d 977, 986 (D. Ariz. 2009). "Procedural violations of ERISA do not alter the standard of review unless those violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm." *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 985 (9th Cir. 2005).

## IV.   ANALYSIS

As discussed *supra*, the Plan unambiguously confers discretionary authority to Defendant as administrator. *See Abatie*, 458 F.3d at 963 (finding abuse of discretion the proper standard of review when an "ERISA plan unambiguously grant[s] discretion to the administrator."). Yet Plaintiff argues the Court should still review this case under heightened scrutiny due to Defendant's structural conflict of interest as both administrator and funder. Plaintiff further argues the procedural irregularities in this case merit de novo review. As the Court explains below, there is a structural conflict at play in this case, and Defendant's review did contain some procedural irregularities. However, these violations were not so flagrant as to warrant de novo review of Defendant's claim decision.

### A.   Structural Conflict

In ERISA cases, courts do not require direct evidence a conflict of interest manifestly affected the outcome of a case. Rather, conflicts of interest justify a court's "additional skepticism" because of the unique incentives of ERISA's statutory scheme. *Id.* Regardless of whether Plaintiff proves the conflict of interest affected Defendant's decision-making (here, he does not), the incentives inherent in ERISA cases remain unchanged and require a court review with *some* additional skepticism. *See e.g., Demer*, 835 F.3d 893, 903 ("[T]he lack of such specific evidence does not mean that there is *no* conflict of interest.") (emphasis in original). Structural conflicts do not divest the administrator of his delegated discretion. *Glenn*, 554 U.S. at 115-16. Rather, they weigh

more or less heavily as factors in the abuse of discretion calculus. *Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 563 F. App'x 530, 530-31 (9th Cir. 2014) (citing *Firestone*, 489 U.S. at 115); *see also Abatie*, 458 F.3d at 967. However, here the parties disagree with how much additional scrutiny is merited.

Defendant argues that where there is no evidence the conflict affected the decision-making process, the conflict factor should be assigned little if any weight. *See Abatie*, 458 F.3d at 968; *cf. Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009) (skepticism warranted where there is evidence in the administrative record that "the conflict of interest may have tainted the entire administrative process"). Plaintiff argues that the conflict must be given substantial weight, even arguing for de novo review under *Abatie* due to Defendant's alleged "numerous, deliberate and egregious ERISA procedural violations." (Doc. 79 at 3.); *see also Glenn*, 554 U.S. at 117 ("The conflict of interest …should prove more important…where circumstances suggest a higher likelihood that it affected the benefits decision.").

Here, Defendant's structural conflict should be afforded some weight, but not nearly as much as Plaintiff claims. Plaintiff's opening brief argues the conflict of interest effected the decision-making of Defendant, and this effect is demonstrated by Defendant's breach of its fiduciary duty, its inconsistent denial of LTD benefits after granting STD benefits, and its alleged procedural violations. (Doc. 79 at 10-12.)

First, Plaintiff argues the effect of the conflict is shown by Defendant's violation of its fiduciary duty. To show a breach of duty, Plaintiff relies extensively on the deposition testimony of two of Defendant's employees. (*Id*. at 6-10.) Plaintiff's counsel apparently asked Defendant's employees mid-deposition to define a fiduciary duty. (*Id*. at 6-8.) Plaintiff holds up the flawed on-the-spot answers of these employees as proof that Defendant's overall claims procedures must violate its fiduciary role. (*Id*.) Similarly, Plaintiff questioned the employees about specific Ninth Circuit ERISA caselaw, and argues the deponents' inability to cite precedent is proof they disregard their fiduciary obligations. (*Id*.) However, as this Court has previously held, ERISA does not establish or require that

"claims managers must be familiar with or able to cite controlling Ninth Circuit precedent on demand." *Woolsey v. Aetna Life Ins. Co.*, 457 F. Supp. 3d 757, 767 (D. Ariz. 2020). As such, the cited deposition transcript does not establish a violation of Defendant's fiduciary duties, and in turn does not evidence that Defendant's structural conflict effected its claims procedure.[7]

Second, Plaintiff argues Defendant's structural conflict obviously effected its decision, because it inconsistently denied his LTD benefits after granted his STD benefits. (Doc. 79 at 11-12.) Plaintiff contends that Defendant's financial conflict is the only possible explanation for his STD benefit approval and subsequent LTD benefit denial. In making this argument, Plaintiff declines to address Defendant's explanation: that it approved Plaintiff's disability during diagnostic testing to give Plaintiff time to establish objective evidence of his disability.[8] (Doc. 85 at 24.). As this Court has previously noted, a Defendant's lenience in granting STD benefits during a diagnostic period is not evidence of conflict unless the record independently supports a grant of LTD benefits. *Woolsey*, 457 F. Supp. 3d at 767, n.18. An insurer should be encouraged to grant an insured seeking diagnosis the "benefit of the doubt," without the specter of potentially ceding its discretion to make a long-term benefits decision on the merits of the eventual medical record. *Id*. That

---

[7] Plaintiff also alleges that Defendant violated its fiduciary duty by failing to provide a "full and fair" review, failing to properly investigate his claim, failing to ask for necessary evidence that was lacking, and failing to engage him in a "meaningful dialog," and failing to consult with appropriate healthcare professionals. *See* 29 U.S.C. §§ 2560.503-1(h)(2)-(3) & 3(iii); *Montour v. Hartford Life & Accident Inc. Co.*, 588 F.3d 623, 636 (9th Cir. 2009). However, Plaintiff's in-depth discussion of these arguments occurs in his argument regarding Defendant's alleged procedural violations. The Court will likewise take up analysis of these claims at that juncture.

[8] Plaintiff's Reply does try and argue this was some "post-hoc" rational because many of Plaintiff's symptoms were diagnosed during the pendency of his STD claim. Of course, the time of diagnosis is largely irrelevant unless Plaintiff can show Defendant based the grant of STD on a finding that those diagnosed symptoms were disabling. In the present case Defendant made no such finding. Its initial claims review consistently states that it was granting STD in order to give time for Plaintiff to confirm his symptoms, not because Defendant had affirmatively determined the reported symptoms existed and were disabling. (Doc. 78 at 49.)

is demonstrably just what happened here.

Despite Plaintiff's claim to the contrary, Defendant's original grant of STD benefits was not prefaced on a determination that Plaintiff was demonstrably disabled. (Doc. 78 at 49.) Instead, Defendant's records show it originally approved Plaintiff's short-term disability "to allow for ongoing evaluation and work up for etiology of symptoms." (*Id.*) Defendant reviewed Plaintiff's claim in November 2015, *before the expiration of Plaintiff's STD benefits*, and found that in light of new medical records Plaintiff did not merit continued STD benefits. (*Id.*) However, Defendant continued Plaintiff's grant of benefits through the "STD max date" to allow for continued testing. (*Id.* at 46.) As such, it does not appear to the Court that Defendant's grant of STD benefits and denial of LTD benefits were inconsistent. Further, the two decisions do not show that Defendant's structural conflict influenced its decision of Plaintiff's claim.

Finding Plaintiff's arguments here unpersuasive, the Court reviews Defendant's conduct under the deferential abuse of discretion standard, with only a moderate amount of additional skepticism required by Defendant's structural conflict of interest.

**B.     Procedural Irregularities**

With Defendant's structural conflict of interest established, the Court must weigh the significance of any procedural irregularities to determine whether they merit heightened scrutiny or even *de novo* review. Like a conflict of interest, procedural irregularities can "reduce[] the deference owed to an administrator's decision to deny benefits" and heighten judicial scrutiny. *Abatie*, 458 F.3d at 972 (citing *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1006 (10th Cir. 2004)). "A more serious procedural irregularity may weigh more heavily." *Id.*

Plaintiff accused Defendant of a slew of procedural violations in an effort to heighten the scrutiny applicable in this case. The Court takes up an in-depth analysis of each of these allegations in the sections below adjudicating the merits of whether Defendant abused its discretion. As such, the Court need not reiterate that discussion here. It is sufficient here to note that, as the analysis below will show, the record does not suggest

"wholesale and flagrant violations of the procedural requirements of ERISA" that necessitate *de novo* review. *Id.* at 971. The procedural irregularities Plaintiff identifies were largely inconsequential or minor. *See Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003) (delineating between innocuous procedural violations where "[o]rdinarily, a claimant . . . is entitled to no substantive remedy" and those that "result in substantive harm" where "a court must consider . . . whether the decision to deny benefits in a particular case was arbitrary and capricious") (citation and internal quotation marks omitted). The Court will weigh them in its analysis according to their effects.

**C.   Merits**

Having disposed of the parties' arguments regarding preliminary matters and the weight of deference applicable to this case, The Court will turn the ultimate question: whether Defendant abused its discretion in the denial of Plaintiff's claim. Plaintiff argues Defendant abused its discretion because its decision: relied on incorrect facts, was inconsistent with its "Rule 30(b)(6) testimony", was contrary to substantive evidence, and was based on no fewer than twelve procedural violations. (Doc. 79.) The Court will examine each of these claims in turn.

i.      "Erroneous Facts"

Plaintiff argues the Defendant obviously abused its discretion because it relied on a clearly erroneous finding of fact in denying his claim. (Doc. 79 at 15.) "[A]n administrator…abuses its discretion if it relies on clearly erroneous findings of fact in making benefit determinations." *Taft v. Equitable Life Assur. Soc.*, 9 F.3d 1469, 1473 (9th Cir. 1993). The fact Plaintiff alleges to be erroneous was Defendant's statement in its denial letter that it had contacted "Dr. Anderson's office and confirmed that your last office visit was December 28, 2015 and that there were no restrictions and limitations at that office visit." (Doc. 79 at 15.)

Here, the Court finds Plaintiff has not presented adequate evidence showing Defendant relied upon an erroneous fact. There is substantive evidence in the

administrative record showing that the call occurred. (Doc. 78-1 at 156-57.) Further, it is evident that Defendant contacted Dr. Anderson's office because the office responded by faxing a copy of Plaintiff's latest SOAP note, (*Id.* at 158-59), indicating Plaintiff's current symptoms, diagnoses, and objective condition. As Defendant stated, the case notes did not indicate any restrictions or limitations on Plaintiff's ability to work. (*Id.*) As such, it appears the call Defendant relied upon did occur and the information noted in Plaintiff's initial denial letter was correct.

ii.   Competency of Facts Relied Upon

Plaintiff next argues that even if the Defendant did in fact call Dr. Anderson's office, and the notes did not contain any restrictions or limitations, Defendant erred by failing to speak with Dr. Anderson personally when inquiring whether any restrictions had been imposed on Plaintiff's ability to work. (Doc. 79 at 16.) Plaintiff further argues that Defendant's own Rule 30(b) deponent testified that relying on communications with a doctor's staff was improper. (*Id.*)

The argument regarding the statements of Defendant's rule 30(b) deponent is misleading. The testimony Plaintiff references discusses whether it would be proper for a reviewing physician to rely on office staff when engaging in a "peer-to-peer" review. (Doc. 79-1 at 70-80.) But the "peer-to-peer" review described is Defendant's procedure for reaching out to resolve *known disagreements in medical diagnosis* with a claimant's treating physician. (*Id.* at 70.) It does not require that Defendant speak to the doctor personally when inquiring as to what limitations are indicated in office's case notes. (*Id.*) Accordingly, Plaintiff's argument fails.

iii.   Use of "Paper Reviewers"

Plaintiff argues that the use of paper reviewers by the Defendant was a procedural irregularity that shows Defendant abused its discretion. However, Plaintiff points to nothing in the Plan that requires Defendant to arrange a physical exam by non-treating physicians. There are some cases where a Defendant's choice to forgo physical examination of a Plaintiff can "raise[s] questions about the thoroughness and accuracy of

the benefits determination[.]" *See Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009) (quoting *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008)).  Forgoing a physical examination is especially questioned when Defendant's "paper review" decision is contrary to the uniform opinion of physicians who treated a Plaintiff in person. *Salomaa*, 642 F.3d at 676 ("the only documents…concluding that he was not disabled were by the physicians the insurance company paid to review his file. They never saw [the claimant]."). However, the weight of Defendants decision to forgo a physical exam is mostly determined on a case-by-case basis when the Court has reason to fear that the records alone do not adequately portray the surrounding facts of a plaintiff's medical history and condition. *See Montour*, 588 F.3d at 634-35 (citing *Glen*, 128 S. Ct. at 2352).

Here, the Court does not believe the reliance on a "paper review" was a "procedural irregularity." As Plaintiff notes in his opening brief, he was evaluated by healthcare professionals more than 130 times. (Doc. 79 at 4.) Both Plaintiff and his attorney were offered the chance to submit any of these records they wished Defendant to consider on appeal. Thus, this is not a case where a "paper review" alone prevented Defendant's reviewers from receiving "all of the relevant evidence" needed to accurately determine Plaintiff's claim. *See Montour*, 588 F.3d at 634 (citing *Glen*, 128 S. Ct. at 2352). Further, unlike *Salomaa*, this is not a case where "the only documents…concluding that he was not disabled" were those written by the Defendant's own staff. 642 F.3d at 676.  Plaintiff saw numerous specialists in internal medicine, endocrinology, cardiology, electrophysiology, urology, neurology, pain medicine, neuropsychology, sleep medicine, and ophthalmology. (Doc. 78 at 105-12, 115-119, 122-24, 127-32; Doc. 78-1 at 34-41, 58-63, 73-75; Doc. 78-6 at 58-59.) Plaintiff saw psychiatrists with the VA and underwent four separate neuropsychological examinations. (*Id.*) Many of Plaintiff's doctors found nothing was wrong with him, and two of his neuropsychologists found that he had no cognitive impairment. As such, this is clearly not a case where Defendant has resorted to a paper review in order to escape the uniform opinion of Plaintiff's treating physicians.

1    iv.    Qualifications of Medical Reviewers

2    Plaintiff next asserts an ERISA procedural violation by alleging "Dr. McAllister

3    [and] Drs. Brown, Zimmerman and Guay" were not competent to review or evaluate

4    Plaintiff claim for disability based on his migraine headaches because "[t]hey are not

5    neurologists." Notably, Plaintiff never extrapolates on this argument, declines to cite any

6    caselaw supporting his argument, and ignores the blatant inconsistency in simultaneously

7    arguing only a neurologist is qualified to evaluate Plaintiff's disability while

8    simultaneously arguing the Court give credence to Dr. Anderson's evaluation of the

9    Plaintiff's condition.[9] (Doc. 79 at 26.)

10    The Court is satisfied with the competence of Defendant's reviewers. They had

11    adequate medical expertise to examine the conflicting findings of Plaintiff's various

12    neurologists and to consider whether or not the diagnosis of migraines was severe enough

13    to constitute a disabling condition.

14    v.    Adequacy of Records Reviewed

15    Plaintiff next argues Defendant committed a procedural violation by failing to

16    review all of Plaintiff's records. Plaintiff accuses Drs. Brown, Zimmerman, and Guay of

17    making their decision based on incomplete information because "Dr. Brown never

18    references any care Mr. Lewis received at Mayo or Barrow" and "Dr. Guay only references

19    the four neuropsychological evaluations." (Doc. 79 at 27.) According to Plaintiff, 'this

---

[9] Plaintiff does, at another point in his brief, cite to "29 U.S.C. § 2560.503-1(h)(3) & 3(iii)."
However, the cited statute does not appear anywhere in the United States Code. The Court
will assume that Plaintiff intended to cite to 29 CFR § 2560.503-1(3)(iii), which requires
an ERISA group health plan to "consult with a health care professional who has appropriate
training and experience." However, the Court finds Defendant met the requirements of that
regulation here.  *Salomaa v. Honda Long Term Disability Plan*, 542 F. Supp. 2d 1068,
1079-80 (C.D. Cal. 2008) ("29 C.F.R. 2560.503-1(h)(3)(iii)…is not so demanding that it
requires plan administrators to retain an expert specific to every unique condition or disease
that an beneficiary may claim.") *rev'd on other grounds* 642 F.3d 666, 2011 U.S. App.
LEXIS 10891 (9th Cir. 2011); *Castilleja v. SBC Disability Income Plan*, No. SA-04-CA-
0385-XR, 2005 U.S. Dist. LEXIS 9904, at *16 n.10 (W.D. Tex. May 19, 2005) ("29 C.F.R.
§ 2560.503-1(h)(iii)…is not so hyper-technical, however, that it requires a medical
diagnosis by a rheumatologist to be reviewed by another rheumatologist.")

violates *Metro. Life Inc. Co. v. Glenn*, 128 S. Ct. 2343, 2345[10] (2008)." While Plaintiff's citation does not refer to any page of the *Glenn* opinion, the Court assumes Plaintiff intends to reference *Glenn's* statement that a Court does not err by considering an insurer's "failure to provide its…medical experts with all of the relevant evidence" in weighing procedural violations. *Id.* at 2352. However, Plaintiff's contention is unavailing.

Plaintiff has not presented adequate evidence to show that relevant evidence was not submitted to its experts. He merely asserts that the evidence must not have been provided because Dr. Brown and Dr. Guay do not specifically address it in their analysis. But Defendant's reviewer "'is not required to disclaim every piece of evidence'" proffered by the Plaintiff. *Peterson v. Fed. Express Corp. Long Term Disability Plan*, 2007 WL 1624644, at *28 (D. Ariz. June 4, 2007); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 n.4 (2003) (explaining ERISA does not require a hearing officer to explicitly reference and explain how it weighed or why it rejected each piece of Plaintiff's evidence). Further, Dr. Brown explicitly notes in his review that he had "completed a full review of the medical record" and that rather than "repeat the data summarized" he would incorporate by reference the previous medical summaries discussed in previous reports. (Doc. 78-6 at 126.) It is unclear whether Plaintiff's counsel merely missed this statement or expects the Court to ignore it, but regardless, the Court finds that Defendant's reviewers were presented with any and all relevant evidence that had been submitted by the Plaintiff.

vi.   Allegations of "Bias" by Reviewers

Plaintiff next argues a procedural violation stems from Defendant's use of biased reviewers. However, Plaintiff relies almost exclusively on conclusory allegations of bias without ever addressing factual circumstances to show its existence. Plaintiff does allege in a single statement that bias is "evident in [Defendant's] one-sided reviews which consistently deemphasized [Plaintiff's] evidence." (Doc. 79 at 27.) Plaintiff makes no effort to explain how Defendant "deemphasized" his evidence other than perhaps the fact that Defendant's reviewers did not ultimately find his evidence sufficient to grant his claim.

---

[10] The text of the actual opinion in *Glenn* starts on page 2346.

Of course, the Court will not find bias whenever an insurer finds Plaintiff's evidence lacking. Further, Defendant's deponents in this case were specifically asked by Plaintiff about Defendants procedures for mitigating bias. (Doc. 79-1 at 108-109). These measures include having a separate quality control department and ensuring that employee performance evaluations are not measured by the specific outcome of a claim. (*Id.*) In light of Plaintiff's failure to produce any persuasive evidence of bias, other than simple disagreement, the Court finds this factor does not show a procedural violation or abuse of discretion.

vii.   Plaintiff's Subjective Complaints

Plaintiff next argues Defendant's reviewers "fail[ed] to consider [his] credible subjective complaints." (Doc. 79 at 27.)  However, as Defendant points out, Defendant's reviewers did in fact reference and address Plaintiff's subjective claims. For instance, Dr. Brown considered and discussed each of these conditions when he completed his analysis. (Doc. 78-6 at 123-130.) Additionally, the internal clinical reviews done by Defendant both for the original claim and for Plaintiff's appeal reference his subjective symptoms extensively, showing that Defendant's staff considered those reported symptoms in their report. (Doc. 78-1 at 163-171, 296-301.)[11]  Further, the administrative records show the Defendant specifically noted Plaintiff's diagnosis of migraine headaches and found they were being adequately managed with medication. (Doc, 78-5 at 150-173.) Thus, Plaintiff's claim that they were not considered is unsupported.

viii.   Defendant's "*Abatie* Duty to Investigate"

Plaintiff next argues that Defendant violated ERISA because it did not follow up and further investigate his claims after determining his subjective conditions were not disabling. Plaintiff argues that under *Abatie*, Defendant had a duty to "investigate further and do more," and should have ordered an IME. (Doc. 79 at 27.) Under *Abatie* "fail[ure]

---

[11] As the Court notes *infra*, Defendant may not have weighed the aggregate effect of Plaintiff's subjective symptoms together with his diagnosed migraines and depression, but that is a different question from whether the Defendant considered them at all. The clinical reviews show it did.

[to] adequately…investigate a claim" can be weighed by the Court in its analysis. *Abatie*, 458 F.3d at 968 (citing *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463-64 (9th Cir. 1997)). However, *Abatie* requires "adequate investigation" not "perpetual or repetitive investigation." (*Id.*)

This point is best demonstrated by contrasting the *Booton* case cited by *Abatie* to Plaintiff's present circumstances. In *Booton*, the court found an insurer failed to adequately investigate a claim where the insurer's own reviewer had opined that additional records could substantiate the plaintiff's claims. 110 F.3d at 1463. It was because Defendant failed to ask for "necessary - and easily obtainable – information," information that plaintiff's doctors were "ready and able" to give, that the Court found defendant had failed its duty to adequately investigate. *Id.* This is clearly not factually analogous to Plaintiff's circumstances. Here, Defendant *did* ask for all relevant information on Plaintiff's claim. Further it specifically followed up by requesting the raw data relevant to Plaintiff's neurological testing. After considering all "necessary" data, Defendant concluded that Plaintiff had not established his disability. Its experts did not opine that there was some missing, easily obtainable, test the completion of which would definitively prove Plaintiff's case. Further, it is not clear how obtaining a neurological IME would be necessary to "adequately investigate" Plaintiff's claims in a case where he had already undergone four conflicting neuropsychological evaluations without obtaining a clear diagnosis one way or another.

ix.   Denial of an IME in a Case involving Phycological and Neurological Complaints

Plaintiff next argues that the use of "paper reviewers" and the failure to obtain an IME violates ERISA here because Plaintiff's claims involved "migraine headaches, cognitive dysfunction, [and] depression/anxiety." (Doc. 79 at 27.) However, Plaintiff cited authority does not stand for this proposition. Plaintiff cites *Montour* to argue that when a claim is based on such symptoms, the absence of a physical exam "raises questions as to Defendant's thoroughness and accuracy." 588 F.3d at 634 (quoting *Bennett*, 514 F.3d at

554).  However, the quoted language of *Montour* had nothing to do with the neurological or psychological nature of the Plaintiff's claims.  Instead, the Court questioned the use of a paper review when reviewers were not presented "with all of the relevant evidence." *Id.* As such, Plaintiff points the Court to no accurate authority mandating IME's for claims involving neurological complaints, and his argument is without merit.

### x.   Failure to Credit Plaintiff's Credible Evidence

Plaintiff next argues that Defendant committed a procedural violation by "fail[ing] to consider most of Plaintiff's evidence…in violation of *Black & Decker Plan v. Nord*, 538 U.S. 822, 834 (2003)." (Doc. 79 at 27.) "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834. However, "courts [may not]… impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.*; *see also Nord*, 538 U.S. at 834 n.4 (holding "ERISA does not support judicial imposition" of a procedural rule requiring the reviewer explicitly explain "why she rejected the opinions of a treating physician."); *Peterson*, 2007 WL 1624644, at *28 (noting the administrator "'is not required to disclaim every piece of evidence.'").

Here, Plaintiff's contention that Defendant failed to consider his credible evidence is unwarranted. Despite Plaintiff's claims to the contrary, the administrative record makes clear that Defendant did review the letter of Dr. Anderson. (Doc. 78-5 at 154.) Plaintiff's arguments that Defendant failed to credit his evidence stem largely from the mere fact that specific reference to each piece of evidence do not appear in each of Defendant's reports and denial letters.  However, as Defendant points out, it "'is not required to disclaim every piece of evidence'" in order to prove it was considered. *Peterson*, 2007 WL 1624644, at *28. Further, Defendant clearly credited Plaintiff's neurological examinations by Dr. Higgins and Dr. Walter. The administrative record shows that Defendant examined their reports and sought the opinion of comparable experts to determined whether the reports evidenced Plaintiff's disability. Thus, Plaintiff has not convinced the Court that

1  Defendant's denial was influenced by some failure to consider Plaintiff's submitted
2  evidence.

3        xi.    Failure to Consider the Actual Duties of Plaintiff's Occupation

4        Plaintiff next argues that Defendant committed a procedural violation of ERISA by
5  "failing to consider the specific material duties of [Plaintiff's] job/occupation even though
6  it had Mr. Janus' vocational report which informed [Defendant] it had mis-classified the
7  job." (Doc. 79 at 28.) In support of this contention, Plaintiff alleges Defendant's reviewer
8  used an outdated version of the Dictionary of Occupational Titles ("DOT"), and further
9  argues it "erroneously believed it only needed to consider how [Plaintiff's] occupation of
10 Hotel Manager was performed in the national economy, rather than how he actually
11 performed it." (*Id*. at 22.)

12       Notably the Plan states that participants are disabled when they cannot perform their
13 "regular occupation." (Doc. 78 at 67.) and that to determine a participant's "regular
14 occupation," Defendant "will look at your occupation *as it is normally performed in the*
15 *national economy,* instead of how the work tasks are performed for a specific employer or
16 at a specific location." (Doc. 78 at 85 (emphasis added).) As such, Defendant's
17 consideration of Plaintiff's occupational duties was correct under the Plan.

18       Plaintiff's cited caselaw to the contrary is not persuasive. Plaintiff cites *Popovich v.*
19 *Metro. Life Ins. Co.*, 281 F.Supp.3d 993, 1006 (C.D. Cal. 2017), and *Salz v. Standard Ins.*
20 *Co.*, 380 F.App'x 723, 724 (9th Cir. 2010), to argue Defendant erred by using an outdated
21 version of the DOT and by failing to look at Plaintiff's specific duties. (Doc. 79 at 22.)
22 However, in *Popovich* the court did not merely rest its decision on the fact that some time
23 had passed since the DOT was written. *Id*. at 1006. Instead, the Court's decision hinged on
24 the fact that the duties of a "news editor," had completely changed since the DOT was
25 written. *Id*. (noting the DOT description of a "news editor" referred only to duties relevant
26 to print media, which had no bearing on Plaintiff's ability work as editor at an internet
27 publication.)  Unlike *Popovich*, the Plaintiff here has not shown that there has been a
28 fundamental shift in the duties of a hotel manager since the DOT was written, thus the

Court finds Defendant's use of the DOT was permissible. *Salz* is similarly inapposite because the Plan language in that case did not specifically state that its determination would be determined by the "national economy" alone. *Compare*, *Salz*, 380 F.App'x at 724 ("the policy states that Standard '*is not limited* to looking at the way you perform your job for your Employer'" (emphasis added)) *with*, (Doc. 78 at 85. ("Unam will look at how your job is performed in the national economy, instead of…a specific employer...").

> xii.   Defendant's Failure to Follow its Claims Manual

Plaintiff argues that Defendant violated ERISA by "fail[ing] to administer Mr. Lewis' claims in accordance with its own claims manual that required it to "consider all medical information, which includes giving deference to the opinion of the claimant's AP [Attending Physician] when making a medical determination." (Doc. 78 at 28.) As for Plaintiff's claim that Defendant has failed to consider "all medical information" the Court has disposed of this contention *supra*. As to Plaintiff's claim that Defendant has violated its claims manual by "not giving deference to the opinion of claimant's [Attending Physician,]" the Court notes that the very next paragraph of the claims manual discussed the steps taken when the reviewers disagree with an attending physician's diagnosis. (*Id.*) As such, it is clear that Plaintiff cannot simply prove a "lack of deference" by showing the Defendant disagreed with Plaintiff's attending physician. Given that Plaintiff makes no efforts to extrapolate on this argument with any greater specificity, the Court finds he has not shown a procedural irregularity based on Defendant's claims manual.

> xiii.   Failure to Engage in a "Meaningful Dialogue"

Plaintiff next argues that Defendant failed to engage him in a "meaningful dialog" prior to denying his claim. Plaintiff's arguments stem from Defendant's failure to provide him with the reports of Dr. Brown and Dr. Zimmerman, as well as Defendant's failure to inform the Plaintiff of what additional information would be needed to establish his disability and perfect his appeal.

ERISA regulations require a Plan administrator to "furnish 'all documents, records, and other information relevant for benefits to the claimant.'" *Salomaa*, 642 F.3d at 680

1  (quoting 29 C.F.R. § 2560.503-1(h)(2)(iii)). "A physician's evaluation provided to the plan

2  administrator falls squarely within this disclosure requirement." *Id*. Further, "plan

3  administrators working with an apparently deficient administrative record to inform

4  claimants of the deficiency and to provide them with an opportunity to resolve the problem

5  by furnishing the missing information." *Montour*, 588 F.3d at 636.

6      Here, Plaintiff is correct that a procedural violation occurred when Defendant failed

7  to provide him with the reports of Dr. Brown and Dr. Zimmerman. Indeed, the Court

8  previously found such an error in its order allowing Plaintiff to supplement the record.

9  (Doc. 61) However, Plaintiff has failed to substantiate his claim that Defendant failed to

10  engage in a meaningful dialog due by failing to tell Plaintiff what was necessary to perfect

11  his appeal. At the time it denied his claim, Defendant had no reason to believe it was

12  operating with an apparently deficient administrative record. *See Montour*, 588 F.3d at 636.

13  And indeed, in this case Plaintiff never seems to get around to specifically addressing what

14  information Defendant had a duty to request at the time of the denial.

15      While the Court has to some extent addressed and rectified Defendant's failure to

16  provide the doctors' reports to the Plaintiff, it was nonetheless a procedural error in

17  Plaintiff's claim. As such, it must be weighed in the Courts analysis of the discretion

18  applicable to this case. *Abatie*, 458 F.3d at 972 (citing *Fought*, 379 F.3d at 1006).

19      xiv.   Failure to Consider Plaintiff's Condition in the Aggregate

20      Plaintiff next argues that Defendant failed to adequately examine whether Plaintiff's

21  complaints and diagnosis could constitute a disability when considered in the aggregate.

22  Defendant does not appear to directly address this contention in its briefing.  As multiple

23  courts have previously held, a Defendant's review should address the cumulative effect of

24  a Plaintiff's symptoms and conditions when determining disability. *Woolsey*, 457 F. Supp.

25  at 772; *Lawrence v. Motorola Inc.*, No. CV-04-1553-PHX-NVW, 2006 U.S. Dist. LEXIS

26  63730, at *24-25 (D. Ariz. Aug. 24, 2006); *Nickola v. CNA Grp. Life Assurance*, Co., No.

27  03 C 8559, 2005 U.S. Dist. LEXIS 16219, at *30 (N.D. Ill. Aug. 5, 2005).

28      Here, it does appear that Defendant's reviewers passed around Plaintiff's claim for

individual reviews of his distinct symptoms without seeming to dedicate space or time to a wholistic review in light of Plaintiff's confirmed diagnoses in the aggregate. As this Court has previously held, even where the vast majority of a record may not support a finding of disability, the insurer's failure to adequately consider the possibility of Plaintiff's conditions' combined effect is at least a procedural violation. *Woolsey*, 457 F. Supp. 3d at 772.

The Court finds the failure of Defendant to consider Plaintiff's conditions in the aggregate dispositive in this case. It appears that relatively early in its review, Defendant started parsing off Plaintiff's symptoms and possible diagnosis for separate review by specialists. As a result, much of Defendant's review shows a tendency to not see the forest for the trees. The reports do not adequately consider the fundamental issue of whether the sum of Plaintiff's diagnosed migraines, PTSD, depression, anxiety, and other symptoms together could form a disabling condition. *See Nickola v. Group Life Ass., Co.*, No. 03 C 8559, 2005 WL 1910905, at *9 (N.D. Ill. Aug. 5, 2005) ("Precedent teaches that an administrator making a disability determination must make a reasoned assessment of whether the total combination of a claimant's impairments justify a disability finding, even if no single impairment standing alone would warrant the conclusion."). Accordingly, the Court will remand the case to Defendant to determine whether the Plaintiff's conditions and symptoms, when taken together, render him unable to perform his occupation.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** remanding the case to Defendant for consideration of whether Plaintiff's diagnoses formed a disability in the aggregate as directed above.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this case and enter judgment accordingly.

Dated this 30th day of March, 2021.

Honorable Susan M. Brnovich
United States District Judge